1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
    Case No. 18-cv-02286-PAB-SKC
 3  _____

 4  ZVELO, INC.

 5       Plaintiff,

 6  vs.

 7  CHECK POINT SOFTWARE TECHNOLOGIES, LTD.,

 8       Defendant.
    _____

 9
10  Civil Action 19-cv-00097-PAB-SKC

11  _____

12  ZVELO, INC.

13       Plaintiff,

14  vs.

15  AKAMAI TECHNOLOGIES, INC.

16       Defendant.

17  _____

18

19          Proceedings before S. KATO CREWS, United States

20  Magistrate Judge, United States District Court for the

21  District of Colorado, commencing at 2:33 p.m., August 6,

22  2019, in the United States Courthouse, Denver, Colorado.

23  _____

24             TELEPHONIC DISCOVERY HEARING

25
```

2

1  _____

2                          APPEARANCES

3          CHAD NITTA, Attorney at Law, appearing for the

4  Plaintiff.

5          CHRISTOPHER DONOVAN, KATHRYN REILLY and MICHAEL

6  STRAPP, Attorneys at Law, appearing for the Defendants.

7  _____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1                    P R O C E E D I N G S
2              (Whereupon, the within electronically recorded
3    proceedings are herein transcribed, pursuant to order of
4    counsel.)
5              THE COURT:  Okay.  We'll go on the record in two
6    matters, 18-cv-2286, Zvelo vs. Check Point Software
7    Technologies; and also 19-cv-97, Zvelo vs. Akamai
8    Technologies, Incorporated.
9              May I have appearances of counsel, please, starting
10   with counsel for plaintiffs in both matters.
11             MR. NITTA:  Thank you, Your Honor.  My name is Chad
12   Nitta from the law firm of Kutak Rock for plaintiff Zvelo.
13             THE COURT:  Okay.  And counsel for --
14             MR. STRAPP:  Your Honor, this is Michael --
15             THE COURT:  Go ahead.
16             MR. STRAPP:  Excuse me.  Your Honor, this is
17   Michael Strapp from DLA Piper.  I'm counsel for both
18   defendant Akamai as well as defendant Check Point.  And with
19   me from the law firm of DLA Piper as well is Chris Donovan.
20             THE COURT:  Okay.
21             MS. REILLY:  And, good afternoon, Your Honor.  This
22   is Katie Reilly from Wheeler Trigg O'Donnell also appearing
23   on behalf of the two defendants.
24             THE COURT:  Okay, great.  Thank you, Counsel.  So,
25   Counsel, we are here for a discovery conference.  I
```

4

1  understand that there are two issues.  One involves the scope
2  of discovery and the other involves the motion to amend filed
3  by the plaintiff.
4           So I will -- I guess we can start with the
5  plaintiff in terms of the issue on the scope of discovery.
6  What I'm wondering is I may need to see what this disclosure
7  was to help inform my analysis of the issue on the scope of
8  discovery, but to the extent we can't hash it out just by way
9  of this discussion or argument of counsel, I might need to
10  see what that disclosure was.
11          MR. STRAPP:  And, Your Honor, before plaintiff
12  responds, if you're interested just as a housekeeping matter,
13  that trade secret disclosure, at least in the Akamai case,
14  and it's substantively identical to the trade secret
15  disclosure that was then in the Check Point case, is now an
16  exhibit that was filed yesterday with the Court.  It's an
17  exhibit to a Rule 11 motion that was filed by defendant
18  Akamai yesterday.  It's Exhibit A1 to that motion.
19          THE COURT:  Exhibit A1 or 81?
20          MR. STRAPP:  A -- letter A1.
21          THE COURT:  Okay.  And that was in the Akamai case?
22          MR. STRAPP:  That's correct.
23          THE COURT:  All right, give me one minute, let me
24  pull that up.  Okay, go ahead, Counsel, I have this pulled up
25  now.

1           MR. NITTA:  Okay, thank you, Your Honor.  Again,

2    this is Chad Nitta for the plaintiff Zvelo.

3           The issue and concern that we have is this case

4    deals with in a broad sense URL and category information

5    that's contained in a very large database, and that

6    information is used by applications that do domain name and

7    URL filtering.  More or less, these applications will send a

8    query to the database to determine how a particular domain

9    name or URL has been categorized.

10          And so they can be categorized as sports or

11   gambling or what have you, and then based on the response

12   that the database provides the application knows how to deal

13   with whether or not to allow a user to access that website or

14   not.

15          And so generally speaking, these URL and

16   domain-filtering products utilized different databases, and

17   Zvelo has one such database that's called a Zvelo db.  And

18   our assertion in this case is that the two defendants are

19   using URL and category information from Zvelo db without

20   Zvelo's permission.

21          And the dispute that we have now is the party --

22   the defendants have identified, in particular, Check Point

23   has identified one product that uses a URL database and

24   Akamai has identified two products that use a URL database,

25   and I think each of them has identified two different vendors

1    that provide URL database information to them for use with

2    these products.

3         And Zvelo is seeking discovery into those

4    databases, and in particular, would like to have the

5    opportunity to have access to the database and run a

6    comparison with the Zvelo db.  And at the present the

7    defendants have taken the position that discovery should be

8    limited to the 85 exemplary URLs that are included in that

9    trade secret disclosure that you're reviewing.

10        THE COURT:  And so the disclosure is just an

11   exemplar?  This is not universe of trade secrets that Zvelo

12   contends the defendant misappropriated?

13        MR. NITTA:  No, Your Honor.  The Zvelo db contains

14   hundreds of millions of URLs and categories and so it's quite

15   large.  And so there would be no confusion that we were

16   talking about URLs and categories, we did identify exemplars

17   that that -- in the trade secret disclosure, but it's not our

18   contention that, and it's not our belief that we should have

19   to produce hundreds of millions of URLs and categories as a

20   gateway to being able to take discovery, particularly when

21   the products at issue have been identified and the databases

22   at issue have been identified and they're not numerous; in

23   each case, at most two.

24        THE COURT:  So that last part again.  You're

25   saying -- so -- well, first -- let me ask this first.  So the

1    allegation in the case is that the Zvelo database itself has

2    been misappropriated and it's that -- that database contains

3    hundreds of millions of these URLs; is that accurate?

4           MR. NITTA:  Yes, Your Honor, we think at a minimum

5    substantial portions of the URLs and categories from the

6    Zvelo db have been provided to the defendants via the vendors

7    that are giving them database information.

8           THE COURT:  And you have information currently to

9    suggest that each of the defendants I guess, what, utilized

10   at least one or two of these URLs that are -- that you

11   contend come from the Zvelo database?

12          MR. NITTA:  Yes, Your Honor, we've identified what

13   we viewed were exemplars.

14          THE COURT:  Okay.  Anything else before I ask for

15   the defendant to respond?

16          MR. NITTA:  No, Your Honor.

17          THE COURT:  Okay.  Mr. Strapp.

18          MR. STRAPP:  Yes, Your Honor.  This dispute may jog

19   your memory about a similar dispute that the parties had

20   leading up to our scheduling conference.  In fact, if you

21   look back to Document 40 in the Akamai case, and there is a

22   similar corresponding document in the Check Point case, which

23   is Your Honor's scheduling order, you'll see that the parties

24   had set forth respective opposing positions concerning

25   whether or not there should even be any obligation for the

1   plaintiff here, Zvelo, to provide a disclosure of the trade

2   secrets that it contended were misappropriated with

3   particularity.

4          And the reason we asked for such a disclosure

5   leading up to the scheduling conference was set forth

6   specifically in the -- in a document to avoid disputes like

7   the one we are currently having right now.

8          We said, for example, that the early identification

9   of trade secrets with particularity would frame the scope of

10  permissible discovery, and that as Courts have recognized for

11  decades, and we cited several cases, until there is a

12  description of trade secrets with particularity, neither the

13  Court nor the parties can know with any degree of certainty

14  whether discovery is relevant or not.

15         Now, I think what's telling here is that when Your

16  Honor addressed these issues several months ago Your Honor

17  sided with defendants and ordered the plaintiff, Zvelo, to

18  describe not just trade secrets generally that it contended

19  were misappropriated, but specifically and with particularity

20  the trade secrets that it contended or misappropriated.

21         So on the one hand, Zvelo satisfied that obligation

22  by providing as an attachment, as Exhibit A to its trade

23  secret disclosure in both cases, a list of 85 URLs and

24  categories.

25         On the other hand, Zvelo attempted to leave itself

1   some wiggle room by claiming in the disclosure itself that

2   those 85 URLs were only exemplar URLs and categories.  And

3   actually stating explicitly in both disclosures that its real

4   contention, not withstanding the fact that it had provided

5   those 85 URLs as exemplars, its real contention in this case

6   was that the entire Zvelo database of hundreds of millions of

7   URLs and categories had been misappropriated.

8          Well, the case proceeded after that disclosure was

9   provided and the parties began exchanging discovery.  And

10  what we learned during the course of the next several months

11  leading up to the filing we made yesterday in the Akamai case

12  is that, in fact, the -- there are -- even amongst the 85

13  URLs and categories that were cherrypicked, handpicked by

14  Zvelo to be listed as exemplars, there are several instances

15  of URLs that are not present in certain databases of Akamai

16  and Check Point, or URLs that are present but have different

17  categories than are assigned by Zvelo.

18          And so we went back to Zvelo and we said it appears

19  that your contention that the entire Zvelo database was taken

20  is in error, and to the extent this case is about anything,

21  it appears that you've made some false and inaccurate

22  statements in this disclosure that you've provided.  And we

23  asked them to withdraw the claim specifically with respect to

24  the Akamai case.

25          In response, I received a letter from Mr. Nitta,

1    and that letter said -- this is a letter dated July 31, where

2    he said, quote, It was never Zvelo's intention to allege that

3    Akamai is using each and every URL and category contained in

4    the current Zvelo db, end quote.

5           So on the one hand, Zvelo has taken the position

6    that these 85 URLs are particular trade secrets that were

7    misappropriated.  On the other hand, they suggested to you on

8    this call and in the document itself, the disclosure, that

9    the entire Zvelo database was taken.  And now at thirdhand,

10   they said in this letter on July 31 that it's not their

11   intention to allege that Akamai is using each and every URL

12   and category contained in the current Zvelo database.

13          And it was precisely to avoid this type of what I

14   would characterize as discovery mischief; that we ask for a

15   trade secret disclosure to be provided at the outset of

16   discovery with particularity so the parties and the Court

17   would be able to frame discovery in a reasonable and

18   meaningful way moving forward.

19          Zvelo it seems unwilling to provide any outer

20   boundaries on exactly what it contends was taken, yet on the

21   same token, by the same token says that it should be entitled

22   to investigate whether hundreds of millions of particular URL

23   category combinations are present in several different

24   databases of the defendants.  And we believe that's

25   inappropriate, especially in light of Your Honor's earlier

1    ruling about the importance and the requirement for Zvelo to

2    provide a trade secret disclosure that included the trade

3    secrets alleged to be misappropriated with particularity.

4              THE COURT:  Okay.  So, Mr. Nitta, I'm looking at

5    allegations from the complaint, and the complaint alleges

6    that -- or actually, I guess I think this is the complaint

7    from the Check Point matter.  I didn't compare the

8    complaints.  I'm assuming -- I don't know if these are

9    identical or not.  But in any event, at paragraphs 53 through

10   59, in that complaint it's alleged that the trade secrets

11   improperly acquired, used and/or disclosed by Check Point

12   relate to the confidential and propriety Zvelo database,

13   including but not limited to the lexicon of categories

14   developed by Zvelo and the millions of URLs categorized by

15   Zvelo.  Then it alleges the Zvelo database is a valuable and

16   lucrative asset, thus Zvelo that constitutes a legally

17   protected trade secret.  Zvelo developed and retains all

18   rights to the Zvelo database and all information contained

19   therein, et cetera.

20             So is the -- is the allegation here that the

21   entire -- that the database itself was misappropriated?  So,

22   for example, I suppose that would mean that there is evidence

23   to suggest that the defendants perhaps copied the database

24   and, you know, mirrored it or put it on a thumb drive or

25   something and they've absconded with the database and are

1    thus misappropriating the database, or is the allegation that

2    there are -- that certain contents from the database were

3    misappropriated?

4         So if the database contained millions of URLs, is

5    the allegation that the defendants misappropriated all of

6    those or is the allegation that there are certain of the URLs

7    that the defendants misappropriated?

8         MR. NITTA:  Your Honor, the -- as we say at the

9    bottom of page 2 of the trade secret disclosure, our position

10   that the products that Akamai and Check Point are using

11   contain significant portions of the information from the

12   Zvelo db.  So we are not saying that every single URL that

13   was in this Zvelo db and every single category that are being

14   used by the defendants.

15        I'm not sure that that answers your question, but

16   we are not suggesting that they had access to the database

17   and made a copy and are using the entire copy.

18        THE COURT:  And so then does that -- is that then

19   to say -- that then to say that the exemplar -- the 85

20   exemplars, is the allegation that the defendants

21   misappropriated each of those 85 items or are there only

22   certain items within that 85 that the plaintiff contends were

23   misappropriated?

24        MR. NITTA:  Your Honor, our understanding of the

25   purpose of the trade secret disclosure was so that we were --

1   that everyone could understand the types of URLs and

2   categories we were talking about, which we think the

3   defendants have been able to do, given that they were able to

4   identify particular database, particular product and

5   particular vendor.  And so from our view, we succeeded, and

6   the purpose of trade secret was to identify the databases

7   that we were talking about.

8           In Akamai's situation, we don't have access to the

9   database they're using, so I can't tell you specifically

10  about discovery which of the Zvelo db URLs and categories

11  they have.  That's why we're seeking the discovery in order

12  to -- in order to do that comparison.

13          This isn't a situation where the defendants are

14  unclear as to what URLs we're talking about in terms of how

15  they're being used or even the data feed they're located feed

16  they're located in.  They've already identified the data feed

17  itself and they've identified the products that are using it.

18          The dispute is whether or not we should be allowed

19  to have access to the data feed that they've identified in

20  order to do a comparison that we're seeking.

21          MR. STRAPP:  Your Honor, may I inject?  This is

22  Michael Strapp for the defendant.

23          THE COURT:  Yeah, go ahead.

24          MR. STRAPP:  So a couple of points.  First of all,

25  what we asked for and what you granted wasn't that Zvelo

14

1    described its trade secrets with particularity, but rather

2    that Zvelo identify and described the trade secrets that were

3    allegedly misappropriated with particularity.

4            And insofar as what was disclosed, we're only a

5    random sampling of 85 URLs and categories, then I would

6    submit that Zvelo did not comply with the trade secret

7    disclosure requirement.  It hasn't disclosed any trade

8    secrets alleged -- that were allegedly misappropriated with

9    particularity.

10           That's the first point, but the second point is, I

11   want to, if you don't mind and you'll indulge me for a

12   minute, provide me just a little bit more background about

13   the URL category issue and the choice by Zvelo to provide 85

14   particular URLs and categories because I think it's relevant

15   to this discussion.

16           There are certain companies that will make publicly

17   available on the website the URL category combinations that

18   they have in their database.  So, in other words, for

19   example, you can go to Zvelo's website and you can type in

20   any URL you want, cnn.com, for example, and you'll be able to

21   see how Zvelo categorizes its URLs.  That as a side note is

22   one basis for our motion to dismiss which is pending alleging

23   that this isn't a trade secret at all since there is no

24   confidentiality here, but that's a side note.

25           The point is that other companies like Check Point

1    also makes publicly available on their website how they

2    categorize particular URLs and whether particular URLs are in

3    their database.

4              So for purposes of constructing its 85 URL category

5    list in its trade secret disclosure, as Mr. Nitta was hinting

6    at, what Zvelo did is it went into Check Point's look-up

7    tool, found 85 URLs that happened to both be categorized by

8    Check Point as well as by Zvelo and then listed those 85 URLs

9    as cherrypicked URLs in its exemplar disclosures.

10             What's telling is that when it was not able to do

11   that with respect to Akamai, because Akamai does not have a

12   similarly available, publicly available look-up tool, it just

13   used the same 85 URLs it had found through the Check Point

14   look-up tool, and it included those in the Akamai disclosure.

15             Now, when we went back for Akamai and took a look

16   to see whether or not those matched up, basically none of

17   them matched up in terms of the exact same URL category

18   combination that I think was under 5 percent or under 10

19   percent, which is remarkable given that all the parties here,

20   Akamai, Check Point, Zvelo are trying to do the same thing,

21   which is categorize as many URLs as possible and categorize

22   those URLs as accurately as possible.

23             Simply having an overlap was a handful, is what you

24   would expect in any event, would be even a significant

25   overlap if everyone is categorizing espn.com equals sports or

1    cnn.com equals news, the same way.

2           So the point being really is that we've asked for

3    the outset -- from the outset of this case that they provide

4    us -- they agree that it's not the entirety database and that

5    there was no sort of nefarious copying through some thumb

6    drive or something of that nature of the database, but rather

7    that it's some undefined portion of the database of URLs and

8    categories that have allegedly been misappropriated.

9           We want to know what those are so that we can frame

10   discovery and we can test whether there was actually alleged

11   misappropriation here.  We don't believe there was.  That's

12   why we have a motion to dismiss pending and now a Rule 11

13   motion pending, but we think at a minimum discovery should be

14   cabined to what they've actually disclosed with particularity

15   in their trade secret disclosure.

16           MR. NITTA:  And, Your Honor, this is Chad Nitta.

17   Can I just make one small point given as a -- given that Mr.

18   Strapp made the background that he has.

19           THE COURT:  Go ahead.

20           MR. NITTA:  Your Honor, Zvelo has license --

21   licenses third parties to distribute its database, and one of

22   those third parties is a vendor that both defendants are

23   admitting they use.  That third party terminated its

24   relationship with Zvelo, no longer has the right to

25   distribute Zvelo's URLs and categories, and both defendants

1  have acknowledged they're receiving URLs and categories from

2  that same vendor, and so that's part of the basis of why we

3  believe they have and continue to have access to this Zvelo

4  db.

5          So we don't have access to the specific data stream

6  that's being provided by that vendor to either of the

7  defendants to identify specifically which ones URLs and

8  categories we believe are ours.  That's why we're asking for

9  access for purposes of discovery so we can identify the

10  portion that we say came from the Zvelo db.

11          We believe that the defendants are putting the cart

12  before the horse and asking us to prove what they have before

13  they tell us what they have, and to us that's the antithesis

14  of the purpose of discovery.  There is no question about the

15  database that we're seeking access to.  There is no question

16  about the products, there is no question about the scope.

17  They're just asking that we have to say what they have before

18  we produce it and we don't think that that's appropriate.

19          THE COURT:  So it is the case that the purpose of,

20  in at least the Court's understanding in requiring the

21  plaintiff to identify this information was so that whatever

22  it was the defendant -- or I'm sorry, the plaintiff was

23  alleging or claiming was a trade secret that had been

24  misappropriated by the the defendants that that would be

25  identified so that you all will understand what you're

1    fighting over and you could tailor your discovery to whatever

2    it was to alleged to have been misappropriated you could

3    focus your discovery.  So that was the Court's purpose in

4    granting or allowing or requiring this trade secret

5    disclosure.

6              One thing that I'm wondering is -- and so part of

7    where I'm still hazy, I think, is Mr. Nitta, so this

8    discovery dispute that we're discussing right now comes into

9    play because what -- what is the -- what are you requesting

10   now from the defendants?

11             MR. NITTA:  Well, Your Honor, now that we've -- the

12   defendants have identified a particular product and a

13   particular data feed from vendor, we've asked for access to

14   that data feed to run the comparison against the Zvelo db.

15   So --

16             THE COURT:  Slow down one second.

17             MR. NITTA:  I'm sorry.

18             THE COURT:  So put that in terms of I'm looking at

19   Exhibit A -- A1.  So when you say they've identified a

20   specific data feed, does that mean, for example, in line one,

21   which identifies a particular URL and then two different

22   categories, I guess that indicates how Zvelo categorizes that

23   URL, what -- what is it that you've received from the

24   defendants that now you're trying to get more information on?

25   Did they disclose a URL to you and now you're trying to

1  discover information that indicates how they came about the

2  categories that the way that they did?  That's what I'm not

3  clear on.

4           MR. NITTA:  I apologize, Your Honor.  No.  They've

5  identified the source or the depositories where the URLs and

6  categories are.  They have not identified any URLs or

7  categories.  So we're asking to have access to the data feed

8  they've identified so we can do the comparison of our URLs

9  and categories to their URLs and categories.  We're not

10  seeking information about their URLs and categories they've

11  identified.  They have not identified any.

12           MR. STRAPP:  Your Honor, this is Michael Strapp on

13  behalf of defendants.

14           I think that we have provided in connection at

15  least with the Rule 11 motion a chart that lists every single

16  one of these 85 URLs and lists whether or not those URLs are

17  present in Akamai and Check Point databases, relevant

18  databases, and to the extent that they are present, how

19  Akamai and Check Point have categorized those URLs.  So that

20  information has been provided to Mr. Nitta and to Zvelo.  I

21  would disagree with what Mr. Nitta just represented.

22           (Counsel speaking at the same time.)

23           MR. STRAPP:  That is in Exhibit A5 to the motion

24  that Your Honor has.

25           MR. NITTA:  Sorry, Mike, I didn't mean to

1    interrupt.  You're talking about what you filed yesterday and

2    disclosed yesterday?

3           MR. STRAPP:  Correct.  Well, we provided that to

4    you on May 29, Chad.

5           THE COURT:  So, I'm sorry, you guys are going to

6    have to bear with me and explain some of this to me because

7    I'm not familiar with what this data is.  So I'm looking at

8    A5 now, Mr. Strapp.  So there is a category -- there is Zvelo

9    categories 1, 2 and 3.  Then there is SPS categories.  What

10   does that -- what does that information reflect?

11          MR. STRAPP:  That's -- SPS represents one of the

12   Akamai products that's accused -- it's one of the Akamai

13   databases that is accused of allegedly having the -- the URLs

14   and categories that came from Zvelo.

15          THE COURT:  And --

16          MR. STRAPP:  So the way that Akamai categorizes

17   URLs in its SPS database is listed in that column.  And

18   you'll see underneath where it says, SPS categories it also

19   says, Siren (ph) data feed, which means that Akamai doesn't

20   actually source -- doesn't create any of this data itself.

21   It sources it from third parties.  So for its SPS product, it

22   sources from a third party called Siren and for its Answer X

23   (ph) product, it sources from a third party called Semantic.

24          And, yes.

25          THE COURT:  Okay.  So, for example, in that URL

1    Number 1, Zvelo categories 1 and 2, that shows, where it

2    says, Alcohol or community forum, shows that's how Zvelo

3    characterizes that particular URL, and then if you go to SPS

4    categories, that information there, ALC underscore TOB and

5    then forums in quotes, that is showing how Akamai categorizes

6    that same URL?

7             MR. STRAPP:  Right.  And more precisely, that's how

8    Siren categorizes it, and then --

9             THE COURT:  Got you.

10            MR. STRAPP:  -- Akamai receives this Siren data and

11   then provides it to its end users through this SPS product.

12            THE COURT:  And then --

13            MR. STRAPP:  The allegation, as Mr. Nitta

14   (inaudible), isn't really about anything other than the fact

15   that there is an underlying dispute here between -- between

16   Siren and Zvelo, and there is actually a pending litigation

17   in Israel right now concerning that underlying dispute

18   wherein Zvelo alleges that Siren has been improperly using

19   Zvelo data.

20            THE COURT:  Okay.

21            MR. STRAPP:  So this really isn't about Akamai or

22   Check Point at all, except to the extent that Akamai and

23   Check Point are Siren customers.

24            THE COURT:  And then that next category -- that

25   next column Answer X categories, same idea that there is a

22

1   data feed from Semantic which characterizes that same URL as

2   ALCO?

3            MR. STRAPP:  Correct.

4            THE COURT:  Okay.  And, therefore, the discovery

5   that the plaintiff seeks related to what has been disclosed

6   here is what -- what type of information or what type of

7   discovery?

8            MR. NITTA:  Your Honor, what we're seeking is

9   they -- if you look at this Exhibit A in these last two

10  columns, I'm presuming that, without knowing, that defendants

11  consulted their own database and pulled information out to

12  fill these columns.  And we're seeking the discovery access

13  to that same information so we can fill out the categories

14  and understand them ourselves and not have to take this

15  chart, but that's the nature of the dispute, that we want the

16  underlying information that was used to generate what are

17  exemplified in Exhibit A.

18           MR. STRAPP:  But, Your Honor, the point that

19  Mr. Nitta is omitting from his request here is that they're

20  asking for the underlying data for hundreds of millions of

21  URLs that they've never specified or explained why they

22  contend that there is misappropriation.  We've given it for

23  these 85.  That's really the nub of the dispute.

24           THE COURT:  So you've provided that underlying

25  information for these 85; is that correct?

1           MR. NITTA:  No, Your Honor, all we had is what you

2    see.

3           THE COURT:  Sorry, say.

4           MR. STRAPP:  That's the information.

5           THE COURT:  Sorry, you were talking at the same

6    time.  I didn't get the answer to my question as to whether

7    or not the defendants have provided that underlying

8    information for these 85.

9           MR. NITTA:  From Zvelo's perspective, Your Honor,

10   they have not.  All we see is what's in that chart.  We don't

11   know what was consulted.

12          THE COURT:  Mr. Strapp.

13          MR. STRAPP:  And from our perspective, we have

14   provided it.  That's what this information is.  And to the

15   extent that they want the information in, let's say,

16   electronic form, we can provide it to them in a different

17   form.  I think that's really not a dispute, and we're willing

18   to be, you know, to compromise and try to work with Zvelo to

19   get them the 85 URLs and category information in whatever

20   format they prefer, and that's not -- that's not really the

21   issue.  The issue is whether this ultimately dramatically

22   extends into hundreds of millions of URLs and categories that

23   were never specified.

24          THE COURT:  Okay.

25          MR. NITTA:  And, Your Honor, this is Chad Nitta

1    again for Zvelo.  It's Zvelo's position that they -- that we

2    can and will produce this Zvelo db to defendants.  We were

3    asking it to be done in conjunction with their production of

4    their data feeds so everyone would have the same sets of

5    information.  So we're not simply asking them to dig through

6    their stuff without showing our own.

7              THE COURT:  Well, is it the case that -- so if the

8    entire Zvelo database has, you know, 100,000 entries or

9    separate URLs, for example, is it necessarily the case that

10   the defendants are going to also have data feeds pertaining

11   to all 100,000 or is that what part of the case is about?  In

12   other words, the defendants could -- should be able to go to

13   a list of 100,000 -- a list of 100,000 URLs from the Zvelo

14   database and indicate which of those 100,000 the defendants I

15   guess have a data feed on such that that then starts to frame

16   the universe of which URLs are ultimately relevant to the

17   case?  Does that make sense?

18             MR. NITTA:  Your Honor, this is Chad Nitta.  I

19   think so, but if I understand what you're asking, the data

20   feed isn't separated by -- or as far as I know, is not

21   grouped into categories or sections, and so it's not a

22   situation where we're suggesting that they have a certain

23   segment of URLs or -- and not others.

24             I think there may be URLs that -- in general that

25   they don't have, but I don't believe anyone segregates their

25

1    databases by category or into any kind of (inaudible), but

2    I'm not sure that answers your question.

3           MR. STRAPP:  Your Honor, this is Michael Strapp.

4    Can I just try to answer your question, also perhaps provide

5    some context as well.

6           I think that there -- there are for Akamai and

7    Check Point, since neither of these parties are creating

8    their own databases, they're just receiving data feed from

9    others, really I think to the extent that Zvelo wants

10   discovery, it should be seeking discovery from the third

11   parties who alleges has its data, which is Siren.

12          And so they can -- you know, they can do that

13   through subpoena, but really it's Siren who creates these

14   categories and the Siren who has the URLs, and they're the

15   ones who -- who faction this and they're the ones who put

16   together the category information.

17          And I think the reason why, you know, we're

18   resisting the notion that there is just sort of open

19   discovery, because it's not 100,000 URLs, it's 100 million

20   plus URLs and categories.  It's just incredibly burdensome

21   for us try to put that together on behalf of defendants who

22   don't even make these products, but just receive them from

23   third parties, is that as we quoted in Document 40 in the

24   Akamai case, this is a quote from a case we cited, it says,

25   Experience has shown that it's easy to allege that the theft

26

1   of trade secrets was vagueness.  Then take discovery into the

2   defendant's files and then cooperatively specify whatever

3   happens to be there as having been trade secrets stolen from

4   plaintiff.

5         A true trade secret plaintiff ought to be able to

6   identify upfront and with specificity the particulars of a

7   trade secrets without any discovery.

8         And if you listen really carefully to the argument

9   of plaintiff here, they haven't done that, they haven't been

10  able to specify what exactly is at issue here.  They've used

11  the words 85 URLs as an exemplar, they've said it's a

12  significant portion.  At other times in their pleadings they

13  said it's the entire Zvelo db.  Without any conferring around

14  what's at issue here, all the sudden we're getting into

15  discovery about hundreds of millions of URLs and categories

16  that are not even created by either of the defendants in this

17  case.

18        THE COURT:  So I guess that's part of what I'm

19  trying to -- to get at or figure out how we get there

20  because, again, if you start from the premise that the

21  Court's -- the purpose of the Court's order in requiring this

22  disclosure was to set the ground or the framework for here is

23  what we're fighting about, here is what the plaintiff alleges

24  the defendants misappropriated and that's what we're going to

25  take discovery on.  What I -- because of the nature of the

1   data that we're dealing with here and looking at these

2   charts, I guess it's still a little bit unclear to me whether

3   this information does or does not set that universe.

4          If I -- I'm going to endeavor to try an analogy

5   here, but if you -- if I try to dumb this down perhaps to a

6   misappropriation of trade secrets case where you have a

7   plaintiff claiming that the defendant misappropriated the

8   customer list and the reason the plaintiff alleges that is

9   because they are -- plaintiff is aware that the defendant has

10  at least provided services to two of the hundreds of

11  thousands of customers that the -- that the plaintiff has,

12  rather than allowing that plaintiff to take discovery on the

13  universe of customers of that defendant to figure out whether

14  or not there are other customers of the plaintiff that the

15  defendants worked with, one way to narrow that down is you

16  require the plaintiff to produce the plaintiff's customer

17  list and you require the defendant to identify from that list

18  any of the same customers that the defendant has provided

19  services to and that thus frames the universe of the

20  customers for which the plaintiff might claim were

21  misappropriated in some way from the -- by the defendant.

22         And what I can't -- what is still unclear to me

23  from this discussion is whether these lists that we're

24  talking about and looking at in Exhibit A1 and A5 help to us

25  do that.  And so if the plaintiff is saying, We have a

1    database with millions of URLs and we think the defendants

2    misappropriated some of them, can't the plaintiff produce

3    that database and have the defendants go through and identify

4    any of the same URLs for which -- again, I don't quite

5    understand what -- exactly what is you all do with these

6    URLs, but can the defendants go through and identify which

7    URLs that it deals with that are at least the same as are on

8    the Zvelo database list and that's what ultimately what seems

9    Zvelo would be contending are or alleging are URLs that have

10   been misappropriated from that Zvelo database by the

11   defendants?

12           MR. STRAPP:  Here is the problem with that

13   approach, Your Honor.  I don't think it's Zvelo's contention

14   that simply because one URL is in the Zvelo database and that

15   same URL is the Akamai/Check Point database that that means

16   that that was misappropriated.  I think Zvelo would concede,

17   and I'll ask Mr. Nitta whether he agrees, but they would

18   concede that simply because two different third party

19   providers who are trying to categorize the Internet in its

20   entirety both have provided categories for google.com or

21   amazon.com.  That doesn't mean that one misappropriated the

22   other's database simply because those URLs show up in each

23   other's databases.

24           So that's why -- you know, what we said is all

25   along, let's deal with some manageable universe of URL

1   category information that you contend is -- has been

2   misappropriated.  And to the extent you really believe it had

3   a reasonable basis under Rule 11 to bring this case, you at

4   least should know that there are some URLs and categories out

5   there that don't just happen by happenstance to be in both

6   databases but were taken by Akamai or Check Point improperly

7   and misappropriated from Zvelo's database.  So give us that

8   list.  You know, it doesn't necessarily have to be, you know,

9   the be all and end all for this case, but you should know at

10  least on a Rule 11 basis what that category or some sampling

11  of those categories and URLs are and let's do discovery about

12  that and test your claims.

13          And I think that's the way we thought we were going

14  to proceed after we received the trade secret disclosure that

15  had been ordered to turn over, and we said, Okay, you've

16  given us -- you said on the one hand it's just, you know,

17  some vague assertion of hundreds of millions of URLs, but

18  you've also been specific.  You've given us 85 URL

19  categories.  Let's use those as the test basis.

20          And I think one of the reasons we're getting a lot

21  of push back from Zvelo is because when we went out and

22  tested those and started doing the analysis, it doesn't

23  really have any meaningful overlap with our client's data,

24  and so now Zvelo is saying, Well, now, we should be able to

25  go back, just being able to take a look at everything and

1    we'll find you thousands of URLs that happens to overlap

2    because everyone categorizes Google and Amazon, and then

3    we'll stake our misappropriation claim, sort of it fill it in

4    hindsight and retrospect with the benefit of knowing what's

5    in your database and allege that you misappropriated the

6    trade secret, but obviously that's not the way that a trade

7    secret case should proceed.

8            THE COURT:  And -- that was Mr. Strapp, right?

9            MR. STRAPP:  Yes.

10           THE COURT:  Okay.  So I agree and I understand just

11   because something might be on each side's list doesn't mean

12   it's misappropriated.  I'm just saying that's one way to --

13   presumably if it is on each side's list, the plaintiff is

14   going to claim it was misappropriated or maybe not, but it at

15   least maybe sets the framework for what you guys are fighting

16   about.

17           But I come back, I guess, to you, Mr. Nitta, I

18   mean, the ultimate question is, What is it you claim that the

19   defendants misappropriated?

20           MR. NITTA:  Thank you, Your Honor.  I could

21   starting by answering the question you originally asked that

22   Mr. Strapp already responded to.

23           If you're asking if Zvelo would be willing to

24   produce its database or a large part of its database and

25   provide the information that we see in the first four columns

1    of Exhibit A, and in return the defendant would fill in the

2    last two columns, I think that that is something that Zvelo

3    would be happy to do, Your Honor, if that's what's required,

4    if we need to show our cards first, as long as the

5    understanding is we would get the information back.

6              THE COURT:  I think you need to show your cards --

7              MR. NITTA:  We obviously would prefer to do the

8    analysis ourselves, but --

9              THE COURT:  Mr. Nitta, I think you need to show

10   your cards on what is that you claim was misappropriated.

11   What from this Zvelo database does the plaintiff contend was

12   misappropriated by the defendants?

13             MR. NITTA:  I understand, Your Honor, and all I'm

14   saying is that once we do that, what I understood you to

15   suggest was then we would get in return from discovery the

16   information back from the defendants showing the overlaps --

17             THE COURT:  Well, is that --

18             MR. NITTA:  -- (inaudible) discovery.

19             THE COURT:  Are those your cards, it's all the

20   millions of URLs in this Zvelo database, that's what you

21   contend was misappropriated by the defendants?

22             MR. NITTA:  Yes, the compilation of them, yes.

23             MR. STRAPP:  But, Your Honor, Mr. Nitta told me

24   just a week ago that that's not what they contend.  He said

25   in his letter that they're not alleging, and I'll tell you

1   the exact language here so I'm not misquoting it, but

2   Mr. Nitta wrote to me and he said, quote, It was never

3   Zvelo's intention to allege that Akamai is using each and

4   every URL and category contained in the current Zvelo db, end

5   quote.

6           THE COURT:  So which -- which URLs does Zvelo

7   contend the defendants are using or misappropriating?

8           MR. NITTA:  Well, Your Honor, that's the rub, there

9   is not a subset of URLs and categories that can be identified

10  that are not being used.  That's why we want to do a

11  comparison.

12          My only point, as Mr. Strapp continues to quote me,

13  was that we do not maintain that their -- that every single

14  URL in our database is going to show up, but we think if 250

15  million out of 300 show up, that that's significant.

16          THE COURT:  So when --

17          MR. NITTA:  (Inaudible).

18          THE COURT:  When Zvelo --

19          MR. NITTA:  (Inaudible).

20          THE COURT:  Hold on, excuse me.  When Zvelo filed

21  this case, what URLs did it believe or have evidence that the

22  defendants had misappropriated.

23          MR. NITTA:  We believed it was there majority of

24  the Zvelo db that they received from the vendor who had been

25  distributing it on our behalf.

1          THE COURT:  So is there a vendor list is there a

2   vendor --

3          MR. STRAPP:  Your Honor, this is Michael Strapp.

4          THE COURT:  Is there a vendor list with these URLs

5   that is -- is that what you're contending, Mr. Nitta?

6          MR. NITTA:  That we believe that the data feed

7   they're receiving from Siren, Your Honor, is filled with

8   Zvelo db information.

9          THE COURT:  So Mr. Strapp, why wouldn't discovery

10  related to the data feed that your client received from Siren

11  be relevant?

12         MR. STRAPP:  Your Honor, if you look at Exhibit A5,

13  which you have in front of you, you'll see that the column

14  second from the right is the Siren data feed.  In other

15  words, that's the product that Akamai is using against data

16  directly from Siren.  And if you compare, for example, URLs

17  Number 21 through 30, so these are 85 handpicked,

18  cherrypicked URLs, including the trade secret disclosure we

19  received from Zvelo, not only are those URLs not categorized

20  the same way in the Siren data feed, they're not even present

21  in the Siren data feed.

22         So Zvelo knows, and they want to dispute this fact,

23  that there is not an identity of overlap between what's in

24  the Siren data feed that is a third party provider to Akamai

25  and Check Point and what's in the Zvelo database.

34

1           They need to provide us with some specificity here

2      so we can test, and we shouldn't be required to examine

3      hundreds of millions of URL category combinations that come

4      from -- that come from Siren, when even 85 that they

5      handpicked show a vast significant portion -- like, if you

6      go, for example, from Number 33 on the list all the way down

7      to Number 85, so that's a vast majority of URLs here, with

8      the exception of 41, none of those are even present, let

9      alone categorized the same way in the Siren data feed.

10          So that's why we filed the Rule 11 motion that we

11     filed yesterday.  We don't believe that there was any basis

12     at all for -- for Zvelo to file this case.  We don't think

13     that -- that's why they've been so vague and haven't been

14     able to be pinned down at what really is at issue here.

15          They said that they're saying it's Siren that's at

16     issue, we've proven to them that that's not the case, and we

17     don't think that this should turn into an open-ended

18     discovery fishing expedition regarding hundreds of millions

19     of URLs, when even 85 handpicked, cherrypicked URLs show that

20     there is a vast majority that don't even have any overlap

21     whatsoever.

22          MR. NITTA:  Your Honor, may -- this is Chad Nitta.

23     Can I respond just briefly to that?

24          THE COURT:  Yeah.

25          MR. NITTA:  Your Honor, this is -- Mr. Strapp hits

1    the nail on the head.  They keep asking us to pick and choose

2    a narrower subset so they don't have to go through the burden

3    of the comparison knowing full well that we don't have access

4    to what their subset is, and so they can make the argument

5    which Mr. Strapp has made, which is to identify portions of

6    the subset that are not overlapping.

7            And in its in some degrees it's willing to -- a

8    small subset out of hundreds of millions, it's a short in the

9    dark, and, Your Honor, we don't think that's an appropriate

10   place to place discovery.

11           I mean, while there are ones that don't overlap,

12   there are ones that do, and whether or not there is a

13   sufficient number that overlap to prove liability is not a

14   threshold for discovery.

15           THE COURT:  And so, Mr. Nitta, for example, line 67

16   is one of those where it says None under the Siren column.

17   That's -- is that one for which you would seek on discovery

18   on the underlying data feed?  If there is no corresponding

19   URL, I guess, or characterization --

20           MR. NITTA:  Would we seek further discovery without

21   it?

22           THE COURT:  Right.

23           MR. NITTA:  If it -- well, I want to be sure I

24   understand the question.  If we were to give a longer list

25   and they run their comparison and give us back this column,

1    would some of them say none?  If you're asking would we seek

2    further discovery, the answer is, no, we would not seek

3    further discovery over the larger list.

4            If you're asking whether or not we still believe

5    we're entitled to a database comparison notwithstanding that

6    none, the answer is, yes, we do believe that we're entitled

7    to larger comparison.

8            THE COURT:  And so, Mr. Strapp, you're opposed to

9    going through this exercise of putting together another A5

10   for the entirety of whatever is in the Zvelo database?  If

11   that is what -- if the contention is that the database has

12   been misappropriated, are you opposed to putting together

13   this list if you're provided with -- rather than exemplar,

14   you're provided with what I guess allegedly is the universe

15   of information that the plaintiff is contending was

16   misappropriated?

17           MR. STRAPP:  Well, if that universe can be defined

18   precisely, we wouldn't be opposed to it, but there has to be

19   some definition, because on the one hand you heard Mr. Nitta

20   agree that it's not the entire database that's at issue here.

21   He's used words like majority, significant, but he has never

22   been pinned down as to what exactly is at issue here.

23           I think one possible middle ground solution here is

24   for the parties to pick a random sample of a thousand URLs

25   and then compare those thousand URLs randomly picked, so

1   there is no selection bias on either side, randomly pick a

2   thousand URLs and see how those URLs are categorized by Zvelo

3   and then how those URLs are categorized in the Siren data

4   feed that shows up in the Akamai check point products.

5           We can run that comparison, that can be the test

6   here and then we can move forward.  And I think to me that's

7   a reasonable middle ground proposal.

8           THE COURT:  Mr. Nitta, what's your view on that?

9           MR. NITTA:  I wasn't clear if Mr. Strapp was

10  suggesting that each side pick a thousand and see if they

11  line up or if he is suggesting that Zvelo would randomly pick

12  a thousand, give them to the defendant and they would then

13  generate the information we see on Exhibit A.

14          MR. STRAPP:  My suggestion is that we use a random

15  URL generator, like, for example, that Google has available.

16  We use that random URL generator to jointly come up with a

17  list of thousand a URLs, and then we put together a chart

18  like the one where we have here where you guys provide us --

19  that is, Zvelo provides us with whether each of those URLs is

20  in this database and the categories.  And we do the same for

21  the Siren data feed as it's patched through to Akamai and

22  Check Point.  And then we've got a chart and we can move

23  forward from there.

24          And to the extent that you review that and you can

25  see that your claims are baseless, you would dismiss the

1   case.  If you believe you have a misappropriation case after

2   reviewing that information, we can move forward.

3        MR. NITTA:  Your Honor, from Zvelo's perspective,

4   since it's our trade secret, I don't know why we would use a

5   random URL generator.  Again, we're happy to produce a larger

6   number of URLs and categories from our database.  I don't

7   think a thousand is appropriate when we're talking databases

8   that have 250 million.  I think it would have to be a

9   significant amount.  I don't know what that number is, but we

10  would be willing produce that from the Zvelo db and ask the

11  defendants to generate the information you see in Exhibit A

12  based on the information we give them.

13       MR. STRAPP:  I guess my question is if you -- if

14  you don't think a thousand is reasonable, then my question to

15  Zvelo would be why did they provide 85 in the trade secret

16  disclosure that was ordered to be produced by the Court.

17       THE COURT:  Mr. Nitta.

18       MR. NITTA:  Your Honor, again, we were

19  understanding that we wanted to give exemplar so people would

20  know what we were talking about.

21       And just so we're clear, Exhibit A that now has a

22  Siren column and a Semantic column, that wasn't information

23  that we had prior to the trade secret disclosure.  Following

24  that the defendants identified the data feeds and the

25  products.  So we think the 85 did the purpose they were

1    supposed to do, which was allow the defendant to identify the

2    data feed, but there was not magic in the 85 as a particular

3    number.

4            THE COURT:  All right, give me a moment here.

5            And so if the parties come up with a number, a

6    thousand or more of these URLs to put in a chart -- the

7    plaintiff put those in a chart similar to Exhibit A1 so that

8    defendants can provide corresponding information similar to

9    what's in A5, then what does that mean -- based on that

10   information, if the plaintiff believes that that helps to

11   support their claim of misappropriation, what does that mean

12   to you all in terms of the way forward?

13           Does that then mean you're litigating on the

14   information contained in that list that you all would have

15   come up with or are we kind of back to square one and you

16   guys are fighting about how much beyond that information is

17   at issue in the case?

18           MR. NITTA:  Your Honor, this is Chad Nitta for

19   Zvelo.

20           I think that if we could agree on a number, Zvelo

21   would be open to using that as a basis of proof.  I mean, I

22   don't want to end up in a world where we're not allowed to

23   say that they're using our overall database because we only

24   have a thousand at issue.

25           I mean, if that's a representative sampling of the

1    databases, I think that that's fine and we won't -- and we

2    can focus the discovery as to those, assuming that they are

3    representative of each side's respective data feeds.

4            MR. STRAPP:  Your Honor, this is Michael Strapp.

5            I think that the concern we've had from the outset

6    is that this case is going to get expanded to a really -- a

7    truly burdensome scope of hundreds of millions of URLs when

8    there has been no identity of what actually is

9    misappropriated.

10           The notion that, you know, we're going to get to a

11   process whereby they're going to sort of figure out through

12   discovery what it is that are the trade secrets is completely

13   putting the whole process of this litigation backwards.

14           But leaving that aside for a second, if we were to

15   proceed as we originally were expected to proceed, which was

16   that they were going to disclose with particularity the trade

17   secrets that were misappropriated, we'll take discovery on

18   that and they'll take discovery on that, we'll move forward

19   and we'll dissolve this case.  That to me is the way this

20   case should have proceeded and should proceed.

21           To the extent that they're going to be given a

22   chance to, let's say, expand that initial list of 85 to

23   include some other set of URLs, I think that's going to be

24   done in carefully managed way to make sure that it's not

25   unfairly burdening the defendants here when our expectation

1    was that Zvelo had actually complied with Your Honor's order

2    and disclosed with particularity not just trade secrets, but

3    trade secrets that alleged were misappropriated.

4         So I just -- I strongly want to, you know, put on

5    the record here that defendants do not agree that it's

6    appropriate to run a litigation process backward wherein

7    plaintiff figures out what its trade secret claims is through

8    discovery as opposed to having a solid basis for identifying

9    what those claims are at the outset of the case.

10        And that's particularly true in this case, Your

11   Honor, because in this case the fact that there is overlap

12   between URLs and categories, as I've mentioned prior, doesn't

13   mean that there has been misappropriation.

14        THE COURT:  So --

15        MR. NITTA:  Your Honor, this is Chad Nitta.  To go

16   back to the analogy that you offered about the customer list.

17   This is a situation where Zvelo is willing to hand over the

18   customer list to allow the comparison to we're not playing

19   hide the ball as to what is our thing, as opposed to waiting

20   to see what's on their -- on the other side and pretending

21   it's our customer list.

22        MR. STRAPP:  But, Your Honor, if we could just put

23   a final point on that analogy.  So I think if we were going

24   to really make that analogy specific here, in that instance

25   of the customer list, the plaintiff would be alleging, it's

42

1    not our entire list that was taken, it's some portion of the

2    list that was taken.  And the obvious next question that the

3    defendant, the Court would all be asking is, Well, what's the

4    portion that was taken?  Identify that and that's what

5    discovery will be about.

6           Here Zvelo's contention isn't that its entire

7    customer list was taken and database was taken.  There is no

8    allegation of wrongdoing, which, you know, prima facie makes

9    their trade secret claim deficient, but that's another story.

10   But to the extent that this is about some portion of it, just

11   identify for us what that portion is and that's what

12   discovery will be about.

13          If you can't even do that, we shouldn't go forward

14   with discovery, and our motion to dismiss should be granted,

15   our motion for sanction should be granted frankly.

16          THE COURT:  And so Mr. Nitta, explain to me again

17   what is it the plaintiffs contend the defendants

18   misappropriated.

19          MR. NITTA:  URL and category information, Your

20   Honor.

21          THE COURT:  But you can't identify that with

22   specificity; is that right?

23          MR. NITTA:  Of these hundreds of millions of URLs

24   that are in Zvelo db, I am not in a position to tell you

25   which specific URLs and categories made it into the data feed

1    that they're receiving and which did not.

2         THE COURT:  And so what leads the plaintiff to

3    believe that URLs from that database have been

4    misappropriated?

5         MR. NITTA:  Again, Your Honor, they're using a

6    vendor that we had provided that to.  We have no reason to

7    believe the vendor was able to recreate a database of our

8    size on its own, and the fact that it's providing a data feed

9    with URLs and categories, our view the only way that could be

10   is because they're using our information.

11        MR. STRAPP:  And, Your Honor, this is a really

12   important point that I want to -- that I haven't had a chance

13   to yet, but I really want to stress for Your Honor.

14        The third party's data feed provider is Siren.

15   That's the third party you've heard about.  The allegation

16   that Mr. Nitta is making is that somehow Check Point and

17   Akamai have done something wrong by using this third party

18   data feed provider because the third party data feed provider

19   is misappropriating Zvelo information.

20        But we received in discovery from Zvelo in a chart

21   that is in our Rule 11 motion at page 2, and what that chart

22   shows is that Zvelo did an independent analysis, back in 2018

23   before the lawsuit was on the horizon, in which based on,

24   quote, a random sample of URLs.  It compared the accuracy of

25   categorization of Zvelo db with accuracy of categorization in

1   the Siren database, and it said in this chart, which we wrote

2   in our Rule 11 motion as part of the basis for our Rule 11

3   motion, is Zvelo categorizes URLs accurately 95 percent of

4   the time, but Siren categorizes URLs accurately only 46.5

5   percent of the time.

6          So the idea here that they had a reasonable basis

7   to allege simply because Akamai and Check Point were using

8   the Siren data feed that they had misappropriated Zvelo trade

9   secrets is belied by their own admission a year before the

10  lawsuit was filed that Zvelo and Siren categorized URLs is

11  absolutely differently from each other.

12         MR. NITTA:  Your Honor, this is Chad Nitta.

13         I'm purposefully not going into the merits of

14  Akamai's Rule 11 motion notwithstanding the fact that

15  Mr. Strapp continues to bring it up.  If you would like me to

16  respond to the merits, I can, but I don't believe they're

17  relevant to the discovery issues we're talking about.

18         THE COURT:  So, Mr. Nitta, from your explanation of

19  what the plaintiffs contend was misappropriated, doesn't that

20  mean that what you contend was misappropriated were the URLs

21  that the defendants received from Siren?

22         MR. NITTA:  That they are receiving, yes, Your

23  Honor, it's a data feed.

24         THE COURT:  And so how big is that data feed or

25  that information?

1          MR. NITTA:  That they're receiving, Your Honor?  I

2    don't know the size of their data.

3          MR. STRAPP:  I believe, Your Honor, that it's tens

4    of millions of URLs.  It may be over a hundred million.  At

5    least over 10 million.

6          THE COURT:  Isn't it at least to some degree -- I

7    don't know if all 10 million are, but isn't that the -- isn't

8    that what the contention is as to what has been

9    misappropriated?  Isn't that what's relevant?

10          MR. NITTA:  Your Honor, that's Zvelo position.

11    That's why we've been seeking discovery about that data feed.

12          MR. STRAPP:  But, Your Honor, to put a finer point

13    on it, Zvelo's contention, at least in my conversations with

14    Mr. Nitta, isn't that it's the entirety of the Siren data

15    feed that's at issue.  It's the portion of the Siren data

16    feed that dates back prior to 2016, because Zvelo and Siren

17    had an agreement whereby Siren was receiving Zvelo data up

18    until 2015 and then the parties terminated their agreement

19    and thereafter all of the new URLs and categories Siren added

20    to its database, Zvelo concedes did not come from Siren.

21          It's only the pre-2016 URLs categories from Siren

22    that are at issue here, even according to what Mr. Nitta has

23    informed me prior to this call.

24          THE COURT:  It's the pre-2015 URL data in the Zvelo

25    database?

1            MR. NITTA:  2016, Your Honor.

2            THE COURT:  2016.

3            MR. NITTA:  Yes, pre-2016.

4            THE COURT:  So how -- how big is that database?

5            MR. STRAPP:  Your Honor, that has never been made

6    clear to me, but I mean to the extent that we can refocus

7    this case on what appears to be the raw allegation, although

8    there has never been specified in the pleadings and has only

9    been informed -- and I've only been informed of this fact

10   over the phone, it really appears to me that what's Zvelo

11   allegation is that Siren had received data from Zvelo prior

12   to 2016, that somehow that data found its way into the Akamai

13   and Check Point products and that that somehow shows trade

14   secret misappropriation.

15           So to the extent that Zvelo wants to provide for us

16   to review a list of pre-2016 URLs and categories from their

17   database and then have us match that up with -- or, you know,

18   give us an exemplar of those, and then that case becomes

19   about that exemplar, that it gets a little bit closer to what

20   the case seems to be about.

21           MR. NITTA:  Your Honor, this is Chad Nitta.  There

22   is -- it's still hundreds of millions, but I don't disagree

23   with what Mr. Strapp said and Zvelo would be willing to do

24   that.

25           THE COURT:  All right.  Because listen, at the end

1   of the day we've got to focus on whatever it is the plaintiff

2   is claiming was misappropriated, and so now as we've drilled

3   down a little I understand it, or correct me if I'm wrong,

4   but the plaintiff is claiming that it's information from the

5   pre-2016 Zvelo database that was shared with or Siren had

6   access to, that's what the plaintiff is claiming was

7   misappropriated.

8          And so it would seem the discovery on the

9   information from that database is what's relevant and

10  proportional to this case.  If we're dealing with hundreds of

11  thousands or millions, then I guess I would defer to the

12  parties to some degree as to how to make that information

13  manageable for purposes of discovery.

14         And my concern is, if we continue to talk about

15  exemplars or random samples, that it's not going to be enough

16  for one or the other side, depending on what that exemplar or

17  comparison data, what have you, reveals, because if it's not

18  quite supporting one side or the other, then I think somebody

19  is probably going to have an issue with that and then they'll

20  be advocating for we've got to make this even broader, which

21  thus starts to look more like a fishing expedition.

22         But in the end of the day, it is incumbent upon the

23  plaintiff to identify what it believes or what it contends

24  was misappropriated by the defendants, and I'm not so sure

25  the plaintiff has done that here.  The plaintiff certainly

1   didn't do that as I had requested by way of the requirement

2   and the scheduling order.  I do not believe I ever used the

3   word "exemplar" in setting that requirement and yet that's

4   what has been produced.

5        So if we've narrowed this down to it's the pre-2016

6   Zvelo database or information from the pre-2016 Zvelo

7   database that was shared with Siren, it seems we've narrowed

8   the universe some, but I'm a still a little unclear on if

9   we've narrowed it enough that you all can work with that

10  information.  And then it seems there may be a couple steps

11  here in terms of discovery.

12       Perhaps the first step is based on that

13  information, Zvelo maybe shoulder produce a similar chart to

14  what it produced with Exhibit A1.  Defendant can then take

15  that chart and do a chart similar to Exhibit A5, and then

16  that perhaps -- then, for example, for the categories in

17  which in a Siren column it says none, presumably there is no

18  discovery on those particular URLs, but for URLs in which

19  there is an indication that there is a characterization or

20  category by the defendants by way of Siren perhaps that is

21  what discovery ends up being framed around.

22       MR. STRAPP:  Your Honor, this is Michael Strapp.  I

23  think that as Your Honor is suggesting, it is plaintiff's

24  burden here to prove trade secret misappropriation and Your

25  Honor hasn't made in incumbent on plaintiff to disclose with

1   particularity what exactly it's alleging is misappropriated,

2   which is obviously the central piece of the case.

3          So I would suggest that before anything happens,

4   plaintiff actually has to comply with Your Honor's order in

5   disclosing with particularity what has been misappropriated,

6   not just provide exemplars or provide amorphous statements

7   like majority or significant portion.

8          And to the extent that the contention really which

9   I believe is the case, but has never actually been stated in

10   a pleading, is that what's at issue here is some pre-2016

11   data that was shared with Siren, then that should be

12   specified, not just in a general level like I'm saying on

13   this call, but rather with specificity providing particular

14   URLs and categories from that pre-2016 data.

15          THE COURT:  Mr. Nitta, can you -- can you do that?

16          MR. NITTA:  I will have to ask my client about the

17   technical aspects of it, but, yes, Your Honor, I think that's

18   something we can and we'll do.  But, Your Honor, just so I'm

19   clear, our understanding will be that once we do that, the

20   defendant can't simply just throw pebbles at that and not

21   give us any information about their database.  Whether it's

22   the information we see in Exhibit A they returned to us or

23   something, but I would like an understanding that simply not

24   take a look at it and say, no, we didn't find it and we're

25   not entitled to discovery.

1          THE COURT:  Well, as I understand it, and I guess

2    either of you let me know if you have a different

3    understanding.  Again, you would put together from whatever

4    that information is a document like A1, Mr. Nitta; in

5    response to that Mr. Strapp is going to put together a

6    document similar to A5; and then based on a whatever the

7    contents of A5 is is going to dictate what is pertinent for

8    discovery.

9          So again, if there is a none identified by Siren,

10   it doesn't sound to me like that's anything for any further

11   discovery on feeds or what have you, but if there is a

12   category that's identified -- and I may need more information

13   before making this as a ruling, but my understanding is, if

14   there is the information identified by beyond none, then

15   presumably or theoretically or potentially then those are the

16   ones for which you all would be taking additional discovery

17   on.

18         So I don't know if that answers your question,

19   Mr. Nitta, but that's my understanding of what the way

20   forward would be.

21         MR. NITTA:  It does, Your Honor, and Zvelo can

22   comply with that.

23         THE COURT:  All right.  So -- and is it accurate,

24   then, Mr. Nitta, that it is the -- the pre- -- let's see --

25   that it is information from the pre-2016 Zvelo database that

1   defendants receive from Siren that the plaintiff contends was

2   misappropriated in each of these respective cases?

3          MR. NITTA:  Yes, Your Honor.

4          THE COURT:  Okay.  Then I will order that the

5   plaintiff produce that information in the same form as what

6   was identified as Exhibit A1 to, I think it was ECF Number 40

7   in the Akamai case, and that that information be produced to

8   the defendants within 14 days of today with the understanding

9   that that information and disclosure contains all of the

10  information that the plaintiff alleges the defendants

11  misappropriated in each case.

12         Then within 14 days of defendant's receipt of that

13  information, defendants will provide and disclose a chart

14  similar to what's at A5 to ECF 40 in the Akamai case to the

15  plaintiff and that should frame -- and to the extent that

16  there are categories that indicate a none, no further

17  discovery will be had as to those particular URLs.

18         As to the others, the parties will need to

19  confer -- I mean, if there is a dispute about whether or not

20  any of the others, I don't know, are relevant or what have

21  you, I'll ask the parties to confer over that.  If you can't

22  reach an agreement on whether or not any of those are the

23  proper subject of discovery, then you can always bring that

24  back to me.

25         MR. STRAPP:  Your Honor, as to the -- as to the

1    last part of your proposed order here regarding the further

2    discovery, I'm not really certain in a case like this what

3    additional discovery is warranted after the chart is

4    provided, because at issue here is not some allegation of

5    wrongdoing of, you know, of theft of thumb drive or veering

6    database.

7          The parties agree on the basic facts here, which

8    are that Akamai and Check Point received data feeds from

9    Siren, and the question is whether or not somehow that means

10   that they can be misappropriating trade secrets of Zvelo.

11         Now, even if there are overlap of URL categories

12   obviously doesn't mean that there is trade secret

13   misappropriation, but the exchange of that information is

14   really sort of the only open question as to whether there is

15   an overlap, and to the extent there is, what that degree of

16   overlap is between the pre-2016 URL category information and

17   the Zvelo db and the corresponding Siren data feeds that are

18   received by Check Point and Akamai.

19         Once that question is answered, the remainder of

20   the facts it appears to me are at least agreed upon the

21   parties at this point.  It's just a legal dispute as to

22   whether or not that can constitute trade secret

23   misappropriation.

24         THE COURT:  And that might be true and I'm not

25   saying that the plaintiff is entitled to that discovery, but

1    I don't know enough about what plaintiff might conclude or

2    infer from whatever this information reveals once you guys

3    have these charts together that it's probably something we'll

4    have to take up at that time to the extent the plaintiff is

5    even seeking anything additional, but I'm not going to make

6    any rulings on that point right now.  It's easy enough to

7    make a ruling on.  If it says none, there wouldn't be any

8    additional discovery to take, but it may be true, and I might

9    agree with you, Mr. Strapp as to what you've just indicated.

10          But first step is let's get what's alleged to be

11   misappropriated out on the table and get the corresponding

12   information from that -- related to that from the defendants.

13   And if there is anything left to fight out about at that

14   point we can.

15          Questions about that?

16          MR. NITTA:  None from plaintiff, Your Honor.

17          MR. STRAPP:  No, Your Honor.

18          THE COURT:  Okay.  With respect to the motion to

19   amend, I'm going to deny that motion for lack of a showing of

20   good cause or excusable neglect.  You all still have a couple

21   months left on your discovery deadline.  If in light of the

22   rulings today that provides or suggests that, as you go

23   through satisfying my orders today, if there is some

24   suggestion from that timing or the results, once you all have

25   fulfilled those obligations, if there is some suggestion or

54

1    good cause to suggest that we need to bump discovery, we can

2    take that up at that time as well, but for now we're going to

3    keep the current deadlines in place and I'm going to deny

4    that motion.

5              Anything else, Counsel?

6              MR. NITTA:  Nothing from plaintiff, Your Honor.

7              MR. STRAPP:  No, Your Honor.

8              THE COURT:  Okay, thank you.  Appreciate your time.

9    Court is adjourned.

10             (Whereupon, the within hearing was then in

11   conclusion at 3:51 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

```
1                    TRANSCRIBER'S CERTIFICATION

2     I certify that the foregoing is a correct transcript to the

3     best of my ability to hear and understand the audio recording

4     and based on the quality of the audio recording from the

5     above-entitled matter.

6

7     /s/ Dyann Labo                    August 14, 2019

8     Signature of Transcriber                 Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```